

Leslie A. Cohen, Esq. (SBN: 93698)
    leslie@lesliecohenlaw.com
J'aime K. Williams Esq. (SBN 261148)
    jaime@lesliecohenlaw.com
LESLIE COHEN LAW, PC
506 Santa Monica Blvd., Suite 200
Santa Monica, CA 90401
Telephone:  (310) 394-5900
Facsimile:  (310) 394-9280

Attorneys for Debtor in Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re

FRANKLIN PACIFIC FINANCE, LLLP,

        Debtors and
        Debtors in Possession

Case No.  2:10-bk-30727-VZ

Chapter 11

NOTICE OF MOTION AND MOTION BY DEBTOR (1) FOR AUTHORITY TO SELL ESTATE'S INTEREST IN REAL PROPERTY WITH LIENS TO ATTACH TO PROCEEDS,  AND (2) FOR DETERMINATION OF THE BUYER TO BE A "GOOD FAITH" PURCHASER WITHIN THE MEANING OF BANKRUPTCY CODE § 363(M) PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF STEPHEN COLLIAS

Date:  March 8, 2011
Time:  11:00 a.m.
Courtroom: 1368

1

TO THE HONORABLE VINCENT ZURZOLO, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ALL CREDITORS AND PARTIES IN INTEREST AND PERSONS REQUESTING SPECIAL NOTICE:

**PLEASE TAKE NOTICE** that Franklin Pacific Finance LLLP, Debtor and Debtor-in-possession in the above-captioned bankruptcy case, (the "Debtor") will and hereby does move the Court for an order: (1) authorizing the sale on an as-is basis, without representations or warranty, and with liens to attach to proceeds, of the Debtor's interest in the real property consisting of a one hundred sixty two (162) unit apartment project known as the Shalamar Apartments, located at 1640 Aquarena Springs Drive, San Marcos, Texas (the "Property") (2) determining the buyer to be a "good faith" purchaser within the meaning of Bankruptcy code Section 363(m).

The motion will be made pursuant to Bankruptcy Code Section 363, Federal Rules of Bankruptcy Procedure 6002 and 2002, and the Local Rules of Bankruptcy Procedure 6004-1(c), and on grounds that the Debtor has negotiated the highest price and best terms reasonably available; and that the proposed all-cash, no contingency sale is in the best interests of the Estate as it is projected to generate net proceeds sufficient to allow payment in full of all claims secured by the Property and administrative claims.

In summary, the material terms of the motion and proposed sale are as follows:

a.  The Debtor shall sell and Student Housing Associates LLC ("Buyer") shall purchase the Property, more specifically defined as that certain real property known as the Shalamar Apartments, located at 1640 Aquarena Springs Drive, San Marcos, Texas, including but not limited to all equipments, fixtures and materials used in connection with the operation, management and maintenance of the Property and the assignment and assumption of all tenant leases by the Buyer;

b.  The Buyer has deposited the sum of $100,000 to be applied against the total purchase price of $5,750,000;

c.  At closing, Seller shall pay ½ of the escrow fee charged by the title company, its proportioned share of the prorations set forth in the Purchase and Sale Contract, the recording fee for the Deed, and transfer taxes, the premium for the owners policy of the title insurance and the cost of the final survey up to $3,000.

1     d.  At closing, the Buyer shall pay ½ the escrow fee charged by the title company, its proportionate share

2        of the prorations set forth in the Purchase and Sale Contract, all recording fees other than for the

3        deed, the cost of the final survey in excess of $3,000 and all costs and premiums associated with

4        modifications for the standard form of the owner's policy of title insurance.

5     e.  Upon Court approval of these terms, Debtor and the Buyer are to execute any and all documents

6        necessary to effectuate the sale of Debtor's entire interest in the Property to the Buyer.

7     f.  The sale shall be by special warranty deed, free and clear of all liens and claims with any such liens

8        and/or claims to attach to proceeds.

9        The motion is based upon this Notice, the accompanying Memorandum of Points and Authorities and

10  Declarations of Stephen Collias, all records and files of the Court in this case, and upon such other evidence

11  and argument that may be presented at the hearing.

12        **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f) any party in

13  interest opposing the Motion must file with the Bankruptcy Court and serve upon Debtor's attorney a written

14  objection to such Motion at least 14 calendar days before the hearing.

15        **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(h) the failure to

16  timely file and serve an objection may be deemed by the court to be consent to the Motion.

17

18  Dated: February 10, 2011                       LESLIE COHEN LAW, PC

19

20                              By:    _/s/ Leslie A. Cohen_____

21                                  Leslie A. Cohen
                                Attorneys for Debtor and Debtor

22                                  In Possession

23

24

25

26

27

28

1  ## MEMORANDUM OF POINTS AND AUTHORITIES

2  ## I.  INTRODUCTION

3  Franklin Pacific Finance, LLLP, debtor and debtor-in-possession in the above captioned bankruptcy case

4  (the "Debtor") seeks an order: : (1) authorizing the sale on an as-is basis, without representations or warranty,

5  and with liens to attach to proceeds, of the Debtor's interest in the real property consisting of a one hundred

6  sixty two (162) unit apartment project known as the Shalamar Apartments, located at 1640 Aquarena Springs

7  Drive, San Marcos, Texas (the "Property") (2) determining the buyer to be a "good faith" purchaser within the

8  meaning of Bankruptcy code Section 363(m).

9  The proposed sale is an arms length sale to a good faith purchaser for fair value.  The property has been

10  fully marketed, and the debtor anticipates recovering sufficient funds to permit payment on allowed undisputed

11  secured claims attaching to the Property with an excess which shall be recovered by the estate.

12  ## II.  FACTUAL BACKGROUND

13  On May 24, 2010, the Debtor filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy

14  Code (the "Petition Date"). The Debtor engages in the business of acquiring and operating real estate assets

15  and loans secured by real estate assets, equipment, vehicles and business assets, and unsecured loans. The

16  Debtor acquires such assets and loans as portfolios or in stand-alone transactions. As such, the Debtor

17  maintains its operations through the collection of principal and interest payments from its notes receivables

18  and receipt of lease payments and sales proceeds from its real estate portfolio.

19  ## III.  EVENTS LEADING TO  SALE OF THE PROPERTY

20  The Debtor owns a 162 unit apartment project located in San Marcos, Texas.  Bank Midwest (BMW)

21  holds a security interest in the form of a Deed of Trust securing an obligation of the Debtor to the Bank with an

22  outstanding principal balance of $3,525,000 as of the Petition Date.

23  The Debtor has agreed, subject to this Court's approval, to sell the Property to the Buyer for the cash

24  sum of $5,750,000 as specified in the Purchase and Sale Agreement and Amendment attached hereto as

25  Exhibit A.   The Debtor believes that this price represents a good value for the estate in that it represents 91%

26  of the Debtor's most recent valuation for the Property at $6,300,000.

27
28

## IV.  SUMMARY OF PROPOSED SALE

Pursuant to the Purchase and Sale Agreement and Amendment, the terms of the sale are generally as follows:

a.  The Debtor shall sell and Student Housing Associates LLC ("Buyer") shall purchase the Property, more specifically defined as that certain real property known as the Shalamar Apartments, located at 1640 Aquarena Springs Drive, San Marcos, Texas, including but not limited to all equipments, fixtures and materials used in connection with the operation, management and maintenance of the Property and the assignment and assumption of all tenant leases by the Buyer;

b.  The Buyer has deposited the sum of $100,000 to be applied against the total purchase price of $5,750,000;

c.  At closing, Seller shall pay ½ of the escrow fee charged by the title company, its proportional share of the prorations set forth in the Purchase and Sale Contract, the recording fee for the Deed, and transfer taxes, the premium for the owners policy of the title insurance and the cost of the final survey up to $3,000.

d.  At closing, the Buyer shall pay ½ the escrow fee charged by the title company, its proportionate share of the prorations set forth in the Purchase and Sale Contract, all recording fees other than for the deed, the cost of the final survey in excess of $3,000 and al costs and premiums associated with modifications for the standard form of the owner's policy of title insurance.

e.  Upon Court approval of these terms, Debtor and the Buyer are to execute any and all documents necessary to effectuate the sale of Debtor's entire interest in the Property to the Buyer.

a.  The sale shall be by special warranty deed, and the buyer shall take free and clear title to the property at closing.

b.  From the proceeds of sale, Bank Midwest ("BMW") will receive immediately upon closing proceeds in the amount of $ 3,956,816 plus applicable per diems, as payoff in full of its secured claim, consisting of principal in the amount of $3,575,000, with the balance of proceeds to be applied to default interest and collection costs.

i.  Of the remaining proceeds, $801,934 will be placed in a segregated cash collateral account will be deposited into a separate Debtor In Possession cash collateral account

for the sole purpose of applying those funds to pay down principal on BMW debt, and

released to BMW upon confirmation of Debtor's Plan of Reorganization;

ii.   The balance of proceeds after the payment and reserves as described above, in the

amount of $941,250 shall be property of Franklin Pacific Finance LLLP.


## V.   DISCUSSION

a.   The Court Should Authorize The Debtor To Sell The Property Free And Clear Of Liens, Claims, And Encumbrances Pursuant To The Terms Of The Purchase and Sale Agreement

Bankruptcy Code Section 363(b)(1) authorizes the trustee or debtor in possession, after notice and a hearing, to use, sell or lease property of the estate outside the ordinary course of business.  One commentator observes that:

[i]n determining whether to approve a proposed sale under section 363, courts generally apply standard that represent essentially a business judgment test.  Some courts have described the standard as one of "good faith" or of whether the transaction is "fair and equitable."  Others question whether the sale is "in the best interest of the estate." (Citations omitted.)  3 Collier on Bankruptcy Paragraph 363.02[1][f].

The proposed sale to the Buyer passes muster under all of the articulated standards.  The Debtor's business expertise is in the acquiring of promissory notes and foreclosing on properties.  The sale of the Property will recover at least $801,934 to the benefit of the estate.    In light of current real estate market conditions and the fact that the sale price is anticipated to generate sufficient proceeds to fully satisfy the debt secured by the Property, the Court should approve the proposed sale of the Property pursuant to Section 363(b)(1) free and clear of liens, claims and encumbrances, and provide that all liens and claims attach to sale proceeds.

b. <u>Overbids</u>

Marketing of this asset has been sufficient to ensure that estate value is being maximized through the proposed sale, particularly in a declining commercial real estate market.  The debtor has exposed the property for sale to all known qualified buyers both directly and by the professional marketing firm CB Richard Ellis which was approved by this court on  August 30, 2010.  Marketing efforts in excess of 120 days in both the fall of 2009 and 2010 were required to locate a qualified a buyer.  There were no formal offers made, and all letters of intent that were received reflected lower purchase prices than the Purchase Offer made here. Here, the value of the property is more than the secured debt and the release price as indicated in the Loan Modification Agreement attached to the Amended Interim Stipulation as set forth in the Collias declaration attached hereto.  The Debtor therefore respectfully submits that the purchase agreement be approved without an overbid process taking place.

c. <u>The Court Should Find That The Buyers Are A Good Faith Purchaser Within The Meaning Of 11 U.S.C. § 363(m)</u>

Bankruptcy Code Section 363(m) provides that a purchaser of property of the estate is protected from the effects of a reversal on appeal of the authorization to sell or lease as long as the purchaser acted in good faith and the appellant failed to obtain a stay of sale.  (Citations omitted) 3 Collier on Bankruptcy paragraph 363.11.  The Code does not define "good faith."  Courts have found that a good faith purchase is "one who buys property…for value, without knowledge of adverse claims," and that lack of good faith is typically shown by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.*

Buyer's management was previously employed by the Debtor.   Debtor has maintained a professional relationship with the Buyer's management, and it was through this professional relationship that Buyer learned that the Property was for sale.  In the past two years, the Property was professional marketed by realtor on two separate occasions, including during the course of this bankruptcy case.  The Debtor has not received any offers that would result in greater value to the estate than the Buyer's purchase agreement.

MOTION FOR SALE OF PROPERTY

1

## VI. CONCLUSION

2      As set forth more fully above, and for the reasons herein, the Debtor respectfully request that

3  the Court (1) authorize the Debtor to sell the Property free and clear as described above, , with liens to attach

4  to proceeds, and (2) for a determination that the ultimate buyer is entitled to the protections set forth at Code §

5  363(m)

6

7  Dated: February 10, 2011                          LESLIE COHEN LAW, PC

8

9                                                       _____/s/ Leslie A. Cohen_____
                                                        Leslie A. Cohen
10                                                      Attorneys for Debtor and Debtor in
                                                        Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF STEPHEN COLLIAS

I, Stephen Collias, declare as follows:

1.    I am the President of Franklin Finance, Inc., the General Partner of Franklin Pacific Finance, LLLP (the "Debtor"), the debtor and debtor-in-possession in the above-captioned bankruptcy case.  Unless otherwise stated, I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently with respect thereto.  Where facts are alleged upon information and belief, I believe them to be true and correct.

2.    On May 24, 2010, the Debtor filed a voluntary bankruptcy petition under Chapter 11 of the Bankruptcy Code (the "Petition Date"). The Debtor engages in the business of acquiring and operating real estate assets and loans secured by real estate assets, equipment, vehicles and business assets, and unsecured loans. The Debtor acquires such assets and loans as portfolios or in stand-alone transactions. As such, the Debtor maintains its operations through the collection of principal and interest payments from its notes receivables and receipt of lease payments and sales proceeds from its real estate portfolio.

3.    The Debtor owns a 162 unit apartment project located in San Marcos, Texas.  Bank Midwest (BMW) holds a security interest in the form of a Deed of Trust securing an obligation of the Debtor to the Bank with an outstanding principal balance of $3,525,000 as of the Petition Date.

4.    The Debtor has agreed, subject to this Court's approval, to sell the Property to the Buyer for the cash sum of $5,750,000 as specified in the Purchase and Sale Agreement and Amendment, a true and correct copies of which are attached hereto as Exhibit A.   The Debtor believes that this price represents a good value for the estate in that it represents 91% of the Debtor's most recent valuation for the Property at $6,300,000.

5.    Pursuant to the Purchase and Sale Agreement and Amendment, the terms of the sale are generally as follows:

   a.    The Debtor shall sell and Student Housing Associates LLC ("Buyer") shall purchase the Property, more specifically defined as that certain real property known as the Shalamar Apartments, located at 1640 Aquarena Springs Drive, San Marcos, Texas, including but not limited to all equipments, fixtures and materials used in connection with the operation, management and maintenance of the Property and the assignment and assumption of all tenant leases by the Buyer;

b. The Buyer has deposited the sum of $100,000 to be applied against the total purchase price of $5,750,000;

c. At closing, Seller shall pay ½ of the escrow fee charged by the title company, its proportional share of the prorations set forth in the Purchase and Sale Contract, the recording fee for the Deed, and transfer taxes, the premium for the owners policy of the title insurance and the cost of the final survey up to $3,000.

d. At closing, the Buyer shall pay ½ the escrow fee charged by the title company, its proportionate share of the prorations set forth in the Purchase and Sale Contract, all recording fees other than for the deed, the cost of the final survey in excess of $3,000 and al costs and premiums associated with modifications for the standard form of the owner's policy of title insurance.

e. Upon Court approval of these terms, Debtor and the Buyer are to execute any and all documents necessary to effectuate the sale of Debtor's entire interest in the Property to the Buyer.

c. The sale shall be by special warranty deed, and the buyer shall take free and clear title to the property at closing.

d. From the proceeds of sale, Bank Midwest ("BMW") will receive immediately upon closing proceeds in the amount of $ 3,956,816 plus applicable per diems, as payoff in full of its secured claim, consisting of principal in the amount of $3,575,000, with the balance of proceeds to be applied to default interest and collection costs of Bank Midwest.

    i. Of the remaining proceeds, $801,934 will be placed in a segregated cash collateral account will be deposited into a separate Debtor In Possession cash collateral account for the sole purpose of applying those funds to pay down principal on BMW debt, and released to BMW upon confirmation of Debtor's Plan of Reorganization;;

    ii. The balance of proceeds after the payment and reserves as described above, in the amount of $941,250 shall be property of Franklin Pacific Finance LLLP.

6. The debtor has exposed the property for sale to all known qualified buyers both directly and by the professional marketing firm CB Richard Ellis which was approved by this court on August 30, 2010. Marketing efforts in excess of 120 days in both the fall of 2009 and 2010 were required to locate a qualified a buyer. There were no formal offers made, and all letters of intent that were received reflected lower purchase

1  prices than the Purchase Offer made here. Here, the value of the property is more than the secured debt and

2  the release price as indicated in the Loan Modification Agreement attached to the Amended Interim

3  Stipulation.

4      7.    Buyer's management was previously employed by the Debtor.   Debtor has maintained a

5  professional relationship with the Buyer's management, and it was through this professional relationship that

6  Buyer learned that the Property was for sale.  In the past two years, the Property was professional marketed

7  by realtor on two separate occasions, including during the course of this bankruptcy case.  The Debtor has not

8  received any offers that would result in greater value to the estate than the Buyer's purchase agreement.

9      I declare under penalty of perjury under the laws of the United States that the foregoing is true and

10  correct.

11      Executed on February 10th, 2011 at  Santa Monica, California.

13      Stephen Collias

MOTION FOR SALE OF PROPERTY

# EXHIBIT A

## CONTRACT FOR SALE

**THIS CONTRACT FOR SALE** (the Contract") is made by and between **FRANKLIN PACIFIC FINANCE, LLLP**, a Nevada limited liability limited partnership (the "Seller") and Student Housing Associates, LLC, a Texas limited liability company and/or permitted assigns (collectively, the "Purchaser"). In consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I
## Sale and Purchase

Subject to the terms and provisions of this Contract, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to buy and pay for all of the following described property (sometimes referred to herein in the aggregate as the "Property"):

(a) that certain tract of land located in San Marcos, Texas, as depicted on Exhibit "A" attached hereto and incorporated herein by reference for all purposes, together with all of Seller's right, title and interest in and to the rights and appurtenances pertaining to such tract of land, including, any right, title and interest of Seller in and to adjacent strips and gores between such tract of land and any abutting properties, adjacent roads, streets, alleys, easements or rights-of-way (collectively, the "Real Property");

(b) the buildings, structures, fixtures and other improvements on the Real Property, including without limitation, the one hundred sixty two (162) unit apartment project known as the Shalamar Apartments, 1640 Aquarena Springs Drive, San Marcos, Texas (collectively, the "Improvements");

(c) all equipment, fixtures, furnishings, appliances, cleaning equipment and supplies, machinery, building materials and other personal property owned by the Seller and used in connection with the operation, management and maintenance of the Real Property and the Improvements, including without limitation, all keys, licenses, permits, books, records, computers, printers, computer software, copying equipment, alarm systems, plans and specifications, architectural and engineering drawings, trade names, trademarks, contract rights, licenses, telephones, telephone number(s), leasing and marketing materials, operating manuals, permits, consents and other intangible property pertaining to the Real Property and Improvements (collectively, the "Personal Property");

(d) Seller's interest under the residential leases as are more particularly described on the rent roll attached hereto as Exhibit B" and incorporated herein, and such other leases as may be executed between the date of this Contract and the Closing Date

(as hereinafter defined) (the "Tenant Leases"), together with all security deposits held by Seller under the Tenant Leases (as set forth on Schedule 1), which security deposits shall be credited upon closing against the Purchaser Price in accordance with Section 7.4 of this Contract and identified in the Due Diligence Period; and,

(e)    All of Seller's right, title and interest in and to (i) all assignable contracts, leases and agreements (collectively, the "Operating Agreements"), relating to the upkeep, repair, maintenance or operation of the real property, improvements or personal property which shall extend beyond the Closing Date, including specifically, without limitation, all assignable equipment leases to the extent assumed by Purchaser, in Purchaser's sole discretion, and (ii) all assignable existing warrantees and guarantees (express or implied) issued to Seller in connection with the Improvements or the Personal Property (collectively, the "Intangibles").

## ARTICLE II
### Earnest Money Deposit

2.1    **Amount and Title Company.**  Purchaser shall, within three (3) business days after the full and final execution of this Contract by both Purchaser and Seller, deposit with Commonwealth Title, Attn: Martin Ripoll (the "Title Company"), the sum of $100,000 (together with any interest thereon, the "Earnest Money"). At the conclusion of the Inspection Period, the Earnest Money shall be deemed non-refundable, unless Purchaser has terminated this Contract pursuant to the terms of Section 5.2 or in the event of a Seller default. The Earnest Money shall be held by the Title Company to be applied against the Purchase Price at Closing (as hereinafter defined), or otherwise disbursed in accordance with the terms of this Contract.

2.2    **Deposit and Application.**  The Earnest Money shall be deposited by the Title Company in an interest bearing account at a federally insured depository institution in Dallas County, Texas acceptable to Purchaser. All interest accruing on the Earnest Money shall accrue to the benefit of Purchaser. In the event that this Contract is actually closed and consummated in accordance with the terms hereof, the Earnest Money shall be applied toward the cash payment due at Closing (as hereinafter defined) by the Purchaser to the Seller in accordance with the terms of Article III herein below. In the event that this Contract does not actually close and consummate in accordance with the terms hereof, the Earnest Money shall be disbursed by the Title Company to Seller or Purchaser (as appropriate) in accordance with the terms of this Contract.

2.3    **Return of Deposit.**  If at any time Purchaser is entitled to a return of the Earnest Money deposit pursuant to this Contract, Title Company shall release the Earnest Money deposit to Purchaser. Otherwise, the Earnest Money deposit shall be applied to the payment of the Purchase Price at Closing.

CONTRACT OF SALE - Page 2

## ARTICLE III
## Purchase Price

(a)    **Price.** The total purchase price for the Property (the "Purchase Price") shall be the sum of $5,750,000 payable by the Purchaser delivering to the Title Company at Closing, cash by current wire transfer of federal funds, cashier's check or other evidence of current funds acceptable to the Title Company for immediate disbursement by the Title Company to the Seller at Closing. Purchaser shall have the responsibility of providing same day immediately available funds so that disbursement of proceeds shall be made on the day of Closing.

(b)    **Independent Consideration.** In addition to all other amounts under this Contract, upon its execution of this Contract, Purchaser shall pay to Seller an amount equal to $100.00 (the "Independent Consideration"), which amount Seller and Purchaser hereby acknowledge and agree has been bargained for and agreed to as consideration for Seller's execution and delivery of this Contract. The Independent Consideration is in addition to and independent of any other consideration or payment provided for in this Contract and will not be refunded in any event.

## ARTICLE IV
## Title and Survey

4.1    **Title Commitment.** Within five (5) business days after the date of this Contract, Seller shall, at Seller's sole cost and expense, obtain and deliver to Purchaser (i) a current commitment for an Owner's Policy of Title Insurance in favor of Purchaser (the "Title Commitment") issued by the Title Company, and (ii) legible copies of all instruments shown as exceptions in the Title Commitment. The Title Commitment shall describe the Real Property, which legal description, unless modified by the Survey in accordance with the terms and provisions of Section 4.2 below, shall be incorporated into this Contract as Exhibit "A-1", and shall constitute the legal description for purposes of the Closing documents.

4.2    **Survey.** Within five (5) business days after the date of this Contract, Seller, at its sole cost, shall deliver to Purchaser a copy of a current A.L.T.A./A.C.S.M. survey (the "Survey") of the Real Property and Improvements, previously prepared by a registered professional land surveyor. Subsequent to the expiration of the Inspection Period, and in the event the Purchaser has not elected to terminate this Contract, the Purchaser may, at its sole cost and expense, secure a recertification of the Survey or obtain a new survey prior to Closing. The Seller agrees to reimburse the Purchaser at Closing for the cost of the recertified Survey or a new survey of the Property (collectively, the "Final Survey") up to the sum of $3,000.00. The Final Survey shall (a) conform to the current minimum standard detail requirements for ALTA/ASCM land title surveys, and (b) reflect the total area of the Real Property, the location of all Improvements, recorded easements and encroachments, if any, located thereon and all building and setback lines

and other matters of record with respect thereto. The Final Survey shall meet the requirements imposed by the Title Company for deletion of the standard survey exception.

4.3    **Review of Title Commitment and Survey**. Purchaser shall have until (5) days prior to the expiration of the Inspection Period (the "Title Review Period"), in which to notify Seller in writing of any objections Purchaser has to any matters shown or referred to in the Title Commitment or the Survey. The standard preprinted exceptions in the Title Commitment which Purchaser does not object within the Title Review Period, and any other title encumbrances or exceptions set forth in the Title Commitment or on the Survey which Purchaser does not object within the Title Review Period, shall be deemed to be permitted exceptions to the status of Seller's title (collectively referred to as the "Permitted Exceptions"). Notwithstanding the foregoing, whether or not Purchaser objects, Seller shall be obligated to remove (a) those attachments or liens securing the payment of money willfully caused to be filed of record by Seller, (b) judgments against Seller and any payments required thereby, and (c) any mortgages encumbering the Property ("Disapproved Exceptions").

4.4    **Objections to Status of Title**. In the event that Purchaser shall object to the status of Seller's title to the Property during the Title Review Period, Seller shall have five (5) days after receipt of Purchaser's objections within which to satisfy such objections, if Seller elects to attempt to satisfy such objections (the "Cure Period"). In the event Seller shall be unable or unwilling to satisfy Purchaser's objections within the Cure Period (and Seller shall have no obligation whatsoever to satisfy any of Purchaser's objections or to expend any sum of money in doing so), Purchaser shall have the option, exercisable by delivery of written notice to the Seller at any time within three (3) business days after the date Purchaser receives Seller's written notification as to the Purchaser's objections which shall not be cured (the "Option Period"), to either (i) waive Purchaser's objections and purchase the Property as otherwise contemplated in this Contract, notwithstanding such objections, in which event the subject matter of such waived objections shall become Permitted Exceptions, and Seller shall convey the Property to Purchaser by the Deed referred to in <u>Section 7.5(a)</u> hereof, subject to the Permitted Exceptions, or (ii) terminate this Contract, which shall be a Permitted Termination as provided in <u>Section 9.1</u> hereof, and the Earnest Money deposit shall be immediately refunded to Purchaser without the necessity of further notice or consent of Seller. In the event Purchaser fails to timely deliver written notice to Seller within the Option Period, Purchaser shall be deemed to have elected to waive Purchaser's objections, and shall have no further right to terminate this Contract pursuant to the terms of <u>Article IV</u> hereof.

4.5    **Amendments to Title Commitment and Survey**. Purchaser shall have the right to object to any exceptions to title or other matters first raised by the Title Company or the surveyor and any amendments to the Title Commitment or the Final Survey issued after the expiration of the Title Review Period by giving written notice of the exceptions or matters to which Purchaser is objecting within ten (10) business days after the issuance of any such amendment or delivery of the Final Survey. If Purchaser does not object to any exception or matter first raised in an amendment to the Title Commitment or the Final Survey received after the expiration of the Title Review Period by giving timely written notice as herein provided, such

exception or matter shall be a Permitted Exception unless it is a Disapproved Exception. In the event Purchaser gives timely written notice of objection to any exception or matter as herein provided, the provisions of Section 4.4 shall apply with respect thereto as if set forth herein in full.

## ARTICLE V
## Due Diligence and Investigation by Purchaser

5.1    **Submission Matters Delivered to Purchaser.**   Within five (5) business days after the execution of this Contract, the Seller shall reasonably deliver to the Purchaser the following items under Seller's custody and control (collectively, the "Submission Matters"):

(a)    copies of all Tenant Leases related to the Property and copies of all correspondence related thereto, together with a Rent Roll (herein so called) as of the first day of the month in which this Contract is executed which reflects (i) the name of the tenant, (ii) the unit number corresponding to each Tenant Lease, (iii) the date on which each Tenant Lease commenced, (iv) the minimum or base rental, (v) the amount of any security deposit, and (vi) the date through which each tenant's rental is paid;

(b)    an inventory of all Personal Property owned and used by the Seller at the Property and, which shall be conveyed to the Purchaser at Closing, if any;

(c)    copies of the tax statements on the Real Property, Improvements and Personal Property for the 2008 calendar year, 2009 calendar year and, if available 2010 calendar year;

(d)    copies of monthly operating statements for the Property for the 2007, 2008, 2009 calendar year, and year to date for the 2010 calendar year;

(e)    copies of any notices of violations, pending lawsuits and other documents and information in Seller's possession related to the ownership and operation of the Property;

(f)    copies of all Operating Agreements (e.g., upkeep, repair, maintenance, landscaping, laundry, etc.);

(g)    copies of all pending maintenance and repair records for the Property;

(h)    copies of site plans, plans and specifications, surveys, topographical surveys, appraisals, and roof, environmental, soil and engineering reports of the Property made for Seller or in Seller's possession, if any;

CONTRACT OF SALE - Page 5

(i)    Copies of any permits or approvals for the Property and copies of Certificates of
Occupancy if available.;

(j)    copies of all utility bills for the Property for the past twelve (12) month period,
and

(k)    a complete and itemized list of all construction to the Property, if any, performed
during the previous twelve (12) month period, including unit details.

All Submission Matters and a copy of any environmental, engineering or other reports procured
by the Purchaser shall promptly be returned to Seller by Purchaser if this Contract is not
consummated for any reason. Seller makes no representation or warranty with respect to any of
the third party reports comprising the Submission Matters, including as to accuracy,
completeness or scope or quality of the work.

5.2    **Inspection Period**.  Seller agrees that Purchaser shall have forty –five (45) days
after receipt of the Submission Matters (the "Inspection Period") in which to review the
Submission Matters, inspect the condition of the Property, conduct an examination of the
Property (including without limitation, a physical inspection, appraisal, environmental study, and
mechanical and engineering inspection of the Property) and to review such other matters as
Purchaser deems necessary in order to determine the suitability of the Property for the
Purchaser's needs.  If within the Inspection Period, Purchaser shall for any reason, or no reason,
in Purchaser's sole discretion, judgment and opinion, disapprove or be dissatisfied with any
aspect of the Property, then Purchaser shall be entitled to terminate this Contract by giving
written notice thereof to Seller prior to the expiration of the Inspection Period, whereupon this
Contract shall automatically be rendered null and void, the Earnest Money deposit shall be
immediately refunded to Purchaser without the necessity of further notice or consent of Seller,
and thereafter neither Seller nor Purchaser shall have any further obligations or liabilities to the
other hereunder except with respect to the indemnities which shall expressly survive any such
termination.  In the event Purchaser fails to notify Seller in writing on or before the expiration of
the Inspection Period of its disapproval of the results of its inspections of the Property, then (a)
the Submission Matters and all of such inspections shall be conclusively deemed to have been
approved; and (b) Purchaser shall have no further right to terminate this Contract unless
otherwise provided herein.

5.3    **Manner and Scope of Inspections**.  During the term of this Contract, Purchaser
and its agents and representatives, shall be entitled to enter upon the Property (as coordinated
through Seller), including all leased areas, upon reasonable prior notice to Seller.
Notwithstanding the foregoing, Purchaser shall not be permitted to interfere unreasonably with
Seller's operations at the Property or unreasonably interfere with any tenant's operations at the
Property, and the scheduling of any inspections shall take into account the timing and availability
of access to tenants' premises, pursuant to its rights under the Tenant Leases or otherwise.  Any
meetings with tenants at the Property shall be conducted only with a representative of the Seller
in attendance.  If Purchaser wishes to engage in any environmental testing or any other testing

which shall damage or disturb any portion of the Property, Purchaser shall obtain Seller's prior written consent thereto (which consent shall not be unreasonably withheld or delayed), and such testing shall be conducted according to protocols reasonably established by Seller. Purchaser shall repair any damage to the Property caused by any such tests or investigations, and indemnify Seller from any and all liabilities, claims, costs and expenses caused therefrom. The foregoing indemnification shall survive Closing or the termination of this Contract.

     5.4   **Confidentiality of Submission Matters**.  As a condition to the Purchaser's receipt of the Submission Matters, the Purchaser agrees to treat such information in accordance with the provisions of this Section 5.4 and to take or refrain from taking certain actions as hereinafter set forth.  Purchaser agrees that the Submission Matters (a) shall be used solely for the purpose of evaluating the purchase of the Property, and (b) shall be kept confidential and shall not be disclosed to any person, firm or entity, except employees, consultants, legal counsel, investors, prospective lenders and representatives of the Purchaser who need to know such information for the purpose of evaluating the potential purchase of the Property, and who have otherwise agreed to be bound by the terms of this Section 5.4.  In addition, disclosure of the Submission Matters may be made upon receipt of the prior written consent of the Seller or as required by law or regulation.  Purchaser acknowledges that given the confidential nature of the Submission Matters, the Seller may be irreparably damaged by any unauthorized disclosure as provided herein.  As a result thereof, the Purchaser agrees that the Seller may enforce this provision of the Contract by legal proceedings, including injunctive and other equitable relief.  The agreement of the Purchaser set forth in this Section 5.4 of the Contract shall terminate as of the Closing Date.

## ARTICLE VI
## Warranties and Representations

     6.1   **Seller's Warranties and Representations**.  Seller represents and warrants to Purchaser as of the date hereof and as of the Closing Date that:

     (a)   Seller has good and indefeasible fee-simple title to the Real Property and Improvements, and at the Closing, Seller shall have and shall convey to the Purchaser good and indefeasible fee-simple title to the Real Property and Improvements, free and clear of all liens, defects, encumbrances, conditions, exceptions, restrictions or other matters affecting title, except the Permitted Exceptions.  Seller has the right, title and authority to execute and perform this Contract and to consummate the transaction contemplated herein.  The execution and delivery of this Contract and the transactions provided for hereunder have been duly authorized by all necessary action of Seller and will not conflict with, or result in a breach of, any terms and provisions of any law, regulation, order, judgment, writ, injunction or decree of any governmental authority having jurisdiction over Seller or the Property, or any agreement or instrument to which Seller is a party or by which it is bound which would have an adverse effect upon

this Agreement or the Property and this Contract shall, when executed and delivered by Seller, constitute the valid and binding obligation of Seller enforceable in accordance with its terms.

(b)     Seller has notified Buyer that Seller is in a Chapter 11 bankruptcy proceeding. As such, this contract and the sale of the property must be submitted to and approved by the United States Bankruptcy Court for the Central District of California (Los Angeles) (the "Bankruptcy Court"). Seller will, upon receipt of this executed contract, promptly file the necessary motions with the Bankruptcy Court and proceed diligently to complete all actions necessary to obtain the Bankruptcy Court's approval to timely conclude the sale as provided for herein. Seller will use commercially reasonable efforts to obtain all necessary approvals of the Bankruptcy Court prior to the expiration of the Inspection Period.

(c)     To the best of Seller's knowledge, Seller has not received any written notice of any pending condemnation or similar proceeding affecting the Real Property and Seller has not received any written notice and has no actual knowledge that any such proceeding is contemplated.

(d)     To the best of Seller's knowledge, Seller has not received written notice of any action, suit, proceeding or claim affecting the Property, or affecting Seller and relating to or arising out of the ownership, operation, use or occupancy of the Property.

(e)     To the best of Seller's knowledge, except for debts, liabilities and obligations for which provision is made herein for proration or other adjustment at the Closing, as of the Closing, all debts, liabilities and obligations arising from the ownership and operation of the Property shall have been paid.

(f)     Seller has notified Buyer that Seller is in a Chapter 11 bankruptcy proceeding. Other than that Bankruptcy proceeding, to the best of Seller's knowledge, there are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships or involuntary proceedings in bankruptcy or pursuant to any other debtor relief laws pending against Seller or to Seller's actual knowledge threatened against Seller or the Property.

(g)     To the best of Seller's knowledge, there are no options, contracts or other obligations outstanding for the sale, exchange or transfer of the Property, or any portion thereof.

(h)     To the best of Seller's knowledge, Seller has not received any written notice from any governmental authority and has no actual knowledge that the construction, occupancy, operation or use of the Property (including the Improvements, fixtures and equipment forming a part thereof) violates any applicable law, statute,

ordinance, rule, regulation, order or determination of any governmental authority (or any board of fire underwriters or other body exercising similar functions), or any restrictive covenant or deed restriction (recorded or otherwise) affecting the Property.

(i)    To the best of Seller's knowledge, and except for the tenants who are in possession of the Property pursuant to the Tenant Leases, there are no parties in possession of, or claiming any possession to, any portion of the Property as lessees, tenants at sufferance, licensees, trespassers, or otherwise.

(j)    To the best of Seller's knowledge, the Tenant Leases (set forth on Exhibit B") are a complete list of all leases and rental agreements in full force and effect as of the date of this Contract and Schedule 1 lists all of the security deposits currently being held by Seller relating to the Property; to Seller's actual knowledge, it is not in default in the performance of any of such lease and rental agreements, there are no lease brokerage agreements, leasing commission agreements or other agreements providing for payments of any amounts for leasing activities or procuring tenants with respect to the Property, and no tenant is entitled to any rebate, concession or other benefit except as specifically set forth in the Tenant Leases. Seller will provide Buyer with a credit at closing for all security deposits held.

(k)    Except for the Tenant Leases and the Operating Agreements, Seller is not a party to any lease, contract or other agreement affecting the Real Property and in effect on the date of this Contract that will survive the Closing. Seller shall terminate, effective as of the Closing Date, all Operating Agreements that Buyer does not elect to assume during the Inspection Period.

For purposes of this Section 6.1, references to "the best of Seller's knowledge", "actual knowledge" or "knowledge" of Seller shall refer only to the knowledge of the Designated Employee (as hereinafter defined) of Seller, and shall not be construed, by imputation or otherwise, to refer to the knowledge of Seller, to any property manager, or to any other officer, agent, manager, representative or employee of Seller or to impose upon such Designated Employee any duty to investigate the matter to which such knowledge, or the absence thereof, pertains. As used herein, the term Designated Employee" shall refer to Marc Heenan on behalf of the Seller and Kimberly Faulkner of Capstone Real Estate Services, Inc. (the "Manager"). Seller represents and warrants to Purchaser that Marc Heenan and the Manager are the parties with the most knowledge of the operations conducted at the Property, and to whom notices concerning the matters described in Section 6.1 would typically be sent.

6.2    **Purchaser's Representations and Warranties**. Purchaser hereby represents and warrants as of the date hereof and as of the Closing Date that:

(a)     Purchaser has the right, title and authority to enter into this Contract, to comply with all the terms and obligations hereof and to consummate the transactions provided for hereunder. The execution and delivery of this Contract and the transactions provided for hereunder have been duly authorized by all necessary action of Purchaser and this Contract shall, when executed and delivered by Purchaser, constitute the valid and binding obligation of Purchaser enforceable in accordance with its terms.

(b)     No consent, approval or other action of, or filing or registration with, any governmental agency, commission or officer is required in connection with the execution or performance by Purchaser of this Contract or any of the transactions provided for hereunder.

(c)     There has not been filed by or, to Purchaser's knowledge, against Purchaser, a petition in bankruptcy or insolvency proceedings or for reorganization, or for the appointment of a receiver or trustee, nor has any such entity made an assignment for the benefit of creditors or filed a petition for an arrangement or entered into any arrangement with creditors or admitted in writing the inability to pay its debts as they become due.

(d)     The execution and delivery of this Contract and the transactions provided for herein shall not result in a breach of any of the terms and provisions of or constitute a default under or conflict with any agreement, indenture, mortgage, lien, lease, consent, license, franchise or other instruments to which Purchaser or any person or entity which Purchaser represents is bound.

6.3     **Survival of Representations and Warranties**. The foregoing representations and warranties of Seller and Purchaser are made as of the date the parties execute this Contract and shall be remade by each party as of the date of Closing; provided that Seller may update the information in such representations and warranties as appropriate from matters occurring (but not caused by or consented to by Seller) between the date Seller executes this Contract and the Closing Date by written notice to Purchaser on or prior to the earlier of two (2) business days after Seller acquiring notice of such change and the Closing Date. All representations and warranties contained in Article 6 hereof shall survive the Closing of this transaction, but shall expire six (6) months after the Closing Date. If within such time Purchaser does not deliver written notice to Seller of any inaccuracy in such representations and warranties, or commence legal action against Seller for any inaccuracy in such representations and warranties, such representations and warranties shall be of no further force or effect.

6.4     **Covenants of Seller**. Seller hereby covenants with Purchaser that, from the date of this Contract until the Closing Date or earlier termination of this Contract:

(a)     Seller shall (i) continue to operate the Property in accordance with its present operating and leasing policy provided that Seller shall using the standard TAA

CONTRACT OF SALE - Page 16

Lease form, and (ii) maintain, in force and effect property and liability insurance with respect to damage or injury to person or property occurring on the Property in at least such amounts as are maintained by Seller as of the date of this Contract. It is the intention of the parties that the general operation of the Property shall not be materially changed between the date of this Contract and the Closing Date, except as herein provided or to the extent Seller, in the ordinary course of business, deems such change to be reasonably necessary or advisable.

6.5    Fees and Commissions.  Purchaser acknowledges that Seller represents that they did not deal with a broker, agent or representative in connection with this transaction.  The parties acknowledge that the property was previously marketed by CBRE of Austin, Texas (the "Broker").  Purchaser represents that they have not dealt with any broker other than the Broker. Seller and Purchaser each agree to indemnify, defend and hold the other harmless from and against any and all loss, cost, damage, liability or expense, including reasonable attorneys' fees, which the other may sustain, incur or be exposed to by reason of their breach of any representations or agreements made in this Section and any resulting claims for a fee or commission by any broker except that Purchaser shall have no obligation to indemnify Seller with respect to any fees claimed by Broker. Seller agrees to be solely responsible for paying any commission due to any broker on the sale of this property, should such ever be deemed due and owing, including any fees which may be deemed due and owing to Broker.   The provisions of this Section 6.5 shall survive the Closing Date, the delivery of the Deed, or the earlier termination of this Contract.

## ARTICLE VII
## Closing

1.    7.1    **Time and Place of Closing**.  Subject to the controlling terms of Section 10.9 below, the consummation of the transaction evidenced by this Contract (the "Closing") shall take place at the offices of the Title Company at approximately 10:00 o'clock a.m. local time, thirty (30) days following expiration of the Inspection Period (the "Closing Date"). Notwithstanding the foregoing, the parties agree to cooperate to close by mail using the Title Company as the Closing agent. Time is of the essence for the parties' performance hereunder.

7.2    **Closing Costs**.  At the Closing, Seller shall pay one-half (1/2) of the escrow fee charged by the Title Company, its proportionate share of the prorations as set forth in Section 7.3 hereof, the recording fee for the Deed (as hereinafter defined), any transfer taxes, the premium for the Owner's Policy of Title Insurance, and the cost of the Final Survey up to the sum of $3,000.00.  At the Closing, Purchaser shall pay one-half (1/2) of the escrow fee charged by the Title Company, for its proportionate share of the prorations as set forth in Section 7.3 hereof, all recording fees other than for recording the Deed, the cost of the Final Survey in excess of $3,000.00, and all costs and premiums associated with modifications to the standard form of the Owner's Policy of Title Insurance.  Each party shall pay its own attorneys' fees; provided,

however, in the event of any litigation arising hereunder, the prevailing party shall be entitled to recover, as part of any judgment rendered, reasonable attorneys' fees and cost of suit. Except as otherwise provided in this Section 7.2 or elsewhere in this Contract, all other expenses hereunder shall be paid by the party incurring such expenses.

7.3   **Prorations.**

(a)   Rent and other income from the Property, other operating expenses, and advance payments of any of the foregoing collected as of the Closing Date by the Seller, shall be prorated to the Closing, based upon actual days involved. All charges pursuant to Operating Agreements affecting the Property (whether or not service is continued by Purchaser) shall be determined as of the day prior to the Closing Date and paid by Seller. Rent and other income from the Property for any period prior to the Closing Date shall be the property of Seller. To the extent that the actual amounts of such charges, expenses, and income referred to in this Section 7.3(a) are unavailable at the Closing Date, the closing statements shall be based upon estimated amounts, and a readjustment of these items shall be made within thirty (30) days after receipt of the actual amounts of such items by either Seller or Purchaser. Purchaser shall receive all rent and other income and bear all expenses after the Closing Date.

(b)   Real property, ad valorem and personal property (if any) taxes, sewer rents and charges, and other state and county municipal taxes, special or otherwise (collectively the "Taxes") for the then current tax year for which the same are levied, imposed or assessed which are liens and which are due and payable in such year shall be prorated at Closing effective as of the Closing Date. If Closing shall occur before the tax rate is fixed for the then current tax year, the apportionment of the Taxes shall be upon the basis of the tax rate for the preceding year. Any difference in the actual and estimated taxes and assessments shall be adjusted in cash between the parties within thirty (30) days following receipt of information confirming the actual amounts thereof. All Taxes imposed because of a change of use or ownership of the Property after or in connection with the Closing shall be the responsibility of the Purchaser.

(c)   No proration shall be made in relation to delinquent rents existing as of the Closing Date, but Purchaser shall make a good faith attempt to collect the same for Seller's benefit after the Closing and such collections, if any, shall be remitted to Seller promptly upon receipt by Purchaser (but only after applying all collections from any delinquent tenant first to rentals then due for any period after the Closing); provided, however, that nothing contained herein shall (i) be construed as a waiver of any of Purchaser's rights under this Contract, or (ii) require Purchaser to institute any suit or collection procedure to collect such delinquent rents. Purchaser need not attempt to collect rents that are more than ninety days delinquent. Seller shall have the ability to choose to take any legal action, at Seller's expense, necessary to collect sums due and owing to Seller as rent and other related costs unpaid at Closing.

7.4   **Security Deposits; Utilities**.  All security deposits paid by the tenants under the Tenant Leases shall be credited against the Purchase Price upon Closing, and Seller shall retain such security deposits.  Purchaser shall thereafter be responsible to the tenants for the security deposits to the extent (i.e., amount) credited against the Purchase Price upon Closing, and shall so notify the tenants in writing at the Closing.  At the Closing, Seller shall notify all utility companies servicing the Property of the change in ownership and direct all billings after the Closing Date to be made to the Purchaser at the address for notices set forth herein, without interruption of service.  Utility meters shall be read during the daylight hours on the Closing Date, if possible, with charges to that time paid by the Seller and charges thereafter paid by the Purchaser.  Any charges for utilities that are paid on a monthly basis shall be prorated between the Purchaser and Seller as of the Closing Date.  Seller shall be entitled to a refund of all utility deposits or bonds which have been deposited with any utility companies and a refund of all unearned premiums with respect to insurance currently in force with respect to the Property, which insurance shall be terminated as of the Closing Date.

7.5   **Deliveries at Closing**.  At the Closing:

(a)   No later than one (1) business day before the Closing Date, Seller shall deposit with Title Company the following:

(i)   A Special Warranty Deed (the "Deed") duly executed and acknowledged by Seller, conveying to Purchaser good and indefeasible fee-simple absolute title to the Real Property, free and clear of any lien, encumbrance or exception other than the Permitted Exceptions.

(ii)   An Assignment and Assumption of Leases duly executed and acknowledged by the Seller.

(iii)   A Blanket Conveyance, Warranty Bill of Sale and Assumption Agreement, duly executed by Seller, conveying to Purchaser the Personal Property.

(iv)   An Owner's Policy of Title Insurance issued by the Title Company, conforming to the requirements of Article IV above, insuring Purchaser's title in the amount of the Purchase Price and containing no exceptions other than (a) Tenant Leases (b) current year real estate taxes not yet due and payable (c) the Permitted Exceptions; and (d) other exceptions, if any, which Purchaser may approve in writing.  The exception for restrictive covenants shall be deleted or the Title Company shall indicate, following such exception, those restrictive covenants included among the Permitted Exceptions.  Purchaser, at Purchaser's sole expense and option, may cause the Title Company to modify the survey exception to read "shortages in area" only, or to issue any other endorsements to its Owner's Policy of Title Insurance as are obtainable under applicable title insurance regulations except that Seller shall incur no expense, except for the basic

premium for the Owner's Policy of Title Insurance and shall have no obligation to insure that such endorsements or modifications are or can be obtained.

(v) Such evidence of the authority and capacity of Seller and its representatives, to deliver the Deed and other conveyancing documents and authority to enter this Contract and perform the terms thereof, as the Purchaser or the Title Company may reasonably require.

(vi) A parties-in-possession and mechanic's lien affidavit and such other certificates as are customary and are reasonably required by Purchaser or Title Company to complete and evidence the transactions contemplated hereby.

(b) At Closing, Seller shall provide to Purchaser the following:

(i) Possession of the Property, subject only to the Tenant Leases and Permitted Exceptions.

(c) Within two (2) business days of Closing, Seller shall provide to the Title Company the following:

(i) To the extent in Seller's possession, the original copies of all Tenant Leases and Operating Agreements, if any.

(ii) All keys, licenses, permits, books, records, plans, specifications and other items related to the Property.

(iii) Tenant notification letters, in form and substance reasonably acceptable to the Purchaser, duly executed by the Seller, notifying the Tenants of the sale of Property and transfer of their security deposits.

(d) No later than one (1) business day before the Closing Date, Purchaser shall deposit with Title Company the following:

(i) The Assignment and Assumption of Leases duly executed and acknowledged by Purchaser.

(ii) The Blanket Conveyance, Warranty Bill of Sale and Assumption Agreement, duly executed by the Purchaser.

(iii) The Tenant notification letters, duly executed by the Purchaser.

(iv) Such evidence of the authority and capacity of Purchaser and its representatives as Seller or the Title Company may reasonably require.

(v)    Such other instruments and documents as are reasonably appropriate, necessary and required by the Title Company or the Seller to complete and evidence the transactions contemplated hereby.

(c)    At Closing, Purchaser shall deposit with Title Company the following:

(i)    The Purchase Price due and all Closing costs which are the obligation of the Purchaser in immediately available funds in accordance with Article III hereof.

7.6    **Title Company's Actions**.  Upon the Closing Date, when Title Company holds the items required to be deposited by Seller and Purchaser as described above and Title Company is prepared to issue and deliver to Purchaser the Title Policy, Title Company is instructed and authorized to:

(a)    Record the Deed in the Office of County Recorder of the County.

(b)    Pay any transfer taxes.

(c)    Instruct the County Recorder to return the Deed to Purchaser after the recordation thereof.

(d)    Disburse to Seller the funds deposited into escrow by Purchaser in the amount of the Purchase Price, less amounts toward payment of any prorations or other amounts chargeable to the account of Seller hereunder.

(e)    Disburse from funds deposited by Purchaser amounts toward payment of all other items chargeable to the account of Purchaser hereunder, and disburse the balance of such funds, if any, to Purchaser.

(f)    Deliver to Purchaser the Assignment and Assumption of Leases, Blanket Conveyance, Warranty Bill of Sale and Assumption Agreement, and the Owner's Policy of Title Insurance issued by the Title Company.

7.7    **Escrow Cancellation Charges**.  If the Closing does not occur because of the default of a party, the defaulting party shall bear all Escrow Cancellation Charges. If the Closing does not occur for any reason other than the default of a party, then Purchaser and Seller shall each pay one-half (1/2) of any Escrow Cancellation Charges.  As used herein, "**Escrow Cancellation Charges**" means all fees, charges and expenses incurred by Title Company or third parties engaged by Title Company, as well as all expenses related to the services of the Title Company in connection with the issuance of the Preliminary Report and other title matters.

## ARTICLE VIII
### Disclaimer;  Release and Waiver of Claims;  Indemnification

8.1   **DISCLAIMER OF WARRANTIES**. EXCEPT AS SET FORTH IN SECTION 6.1 HEREOF, SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING (A) THE NATURE AND CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY ELECT TO CONDUCT, THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS (INCLUDING BUT NOT LIMITED TO THE PRESENCE OF ASBESTOS OR OTHER HAZARDOUS MATERIALS) OR COMPLIANCE WITH APPLICABLE ENVIRONMENTAL LAWS, RULES OR REGULATIONS; (B) THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHERWISE; AND (C) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENTAL ENTITY OR BODY.    PURCHASER ACKNOWLEDGES THAT IT WILL INSPECT THE PROPERTY AND PURCHASER WILL RELY SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF SELLER OTHER THAN AS SET FORTH HEREIN.   PURCHASER FURTHER ACKNOWLEDGES THAT THE INFORMATION PROVIDED AND TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND SELLER (1) HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION; AND (2) DOES NOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. THE SALE OF THE PROPERTY IS MADE ON AN "AS-IS" BASIS, "WHERE-IS", "WITH ALL FAULTS" BASIS INCLUDING WITHOUT LIMITATION ANY CONDITIONS RELATING TO THE ENVIRONMENT, SAFETY OR PUBLIC HEALTH, AND PURCHASER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF SELLER, AND, EXCEPT AS SET FORTH IN SECTION 6.1 HEREOF, SELLER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, TITLE (OTHER THAN THE SPECIAL WARRANTY OF TITLE WITH RESPECT TO THE LAND AND THE IMPROVEMENTS), HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTY OR ANY PORTION THEREOF.

8.2   **RELEASE AND WAIVER OF CLAIMS**.    EXCEPT AS IT MAY CONSTITUTE A BREACH OF A REPRESENTATION OR WARRANTY UNDER SECTION 6.1 HEREOF OR AS OTHERWISE PROVIDED HEREIN, PURCHASER AGREES THAT SELLER SHALL NOT BE RESPONSIBLE OR LIABLE TO PURCHASER FOR ANY CONSTRUCTION DEFECT, ERRORS, OMISSIONS, OR ON ACCOUNT OF ANY OTHER CONDITIONS AFFECTING THE PROPERTY, AS PURCHASER IS PURCHASING THE

PROPERTY AS-IS, WHERE-IS, AND WITH ALL FAULTS. AS SET FORTH IN THE PRECEDING SENTENCE, PURCHASER OR ANYONE CLAIMING BY THROUGH OR UNDER PURCHASER, HEREBY FULLY RELEASES SELLER, ITS EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS FROM ANY AND ALL CLAIMS THAT IT MAY NOW HAVE OR HEREAFTER ACQUIRE, AGAINST SELLER AND ITS RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, REPRESENTATIVES, ATTORNEYS AND AGENTS FOR ANY COST, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM OR RELATED TO ANY CONSTRUCTION DEFECTS, ERRORS, OMISSIONS, OR OTHER CONDITIONS AFFECTING THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING, BUT NOT LIMITED TO, THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES AND CAUSES OF ACTION. THIS COVENANT RELEASING SELLER SHALL SURVIVE CLOSING AND SHALL BE BINDING UPON PURCHASER. SELLER HEREBY ASSIGNS WITHOUT RECOURSE OR REPRESENTATION OF ANY NATURE TO PURCHASER, EFFECTIVE UPON CLOSING, ANY AND ALL CLAIMS THAT SELLER MAY HAVE FOR ANY SUCH ERRORS, OMISSIONS OR DEFECTS OF THE PROPERTY. AS A MATERIAL COVENANT AND CONDITION OF THIS CONTRACT, PURCHASER AGREES THAT IN THE EVENT OF ANY SUCH CONSTRUCTION DEFECTS, ERRORS, OMISSIONS OR ON ACCOUNT OF ANY OTHER CONDITIONS AFFECTING THE PROPERTY, INCLUDING WITHOUT LIMITATION, ANY CONDITIONS RELATING TO THE ENVIRONMENT, SAFETY OR PUBLIC HEALTH, PURCHASER SHALL LOOK SOLELY TO SELLER'S PREDECESSORS OR TO SUCH CONTRACTORS AND CONSULTANTS AS MAY HAVE CONTRACTED FOR WORK IN CONNECTION WITH THE PROPERTY FOR ANY REDRESS OR RELIEF UPON THE ASSIGNMENT BY SELLER OF ITS CLAIMS. PURCHASER RELEASES SELLER OF ALL RIGHTS, EXPRESS OR IMPLIED, PURCHASER MAY HAVE AGAINST SELLER ARISING OUT OF OR RESULTING FROM ANY ERRORS, OMISSIONS OR DEFECTS IN THE PROPERTY. PURCHASER FURTHER UNDERSTANDS THAT SOME OF SELLER'S PREDECESSORS IN INTEREST MAY BE OR BECOME INSOLVENT, BANKRUPT, JUDGMENT PROOF OR OTHERWISE INCAPABLE OF RESPONDING IN DAMAGES, AND PURCHASER MAY HAVE NO REMEDY AGAINST SUCH PREDECESSORS, CONTRACTORS OR CONSULTANTS. THIS WAIVER AND RELEASE OF CLAIMS SHALL SURVIVE THE CLOSING.

## ARTICLE IX
### Termination, Default and Remedies

9.1  **Permitted Termination**. If this Contract is terminated by either Seller or Purchaser pursuant to a right expressly given it to do so hereunder (herein referred to as a "Permitted Termination"), the Earnest Money shall be refunded to Purchaser, and this Contract shall thereafter be null and void.

CONTRACT OF SALE - Page 17

9.2    **Default by Seller**.  Seller shall be in default hereunder upon the occurrence of any one or more of the following events:

(a)    any of Seller's warranties or representations set forth herein are untrue or inaccurate in any material respect when made or at Closing;

(b)    Seller shall fail to meet, comply with or perform any covenant, agreement, or obligation within the time limits and in the manner required in this Contract, for any reason other than a Permitted Termination; or

(c)    Seller shall fail to deliver at the Closing any of the items required of Seller in Section 7.5(a) hereof, for any reason other than a Permitted Termination.

In the event of a default by Seller hereunder, Purchaser may, as Purchaser's sole and exclusive remedies for such default, either (i) terminate this Contract by written notice delivered to Seller at or prior to Closing, which termination shall be a Permitted Termination as provided in Section 9.1 above and all Earnest Money deposited by the Purchaser under this Contract shall be promptly returned to the Purchaser; or (ii) enforce specific performance of this Contract.

9.3    **Default by Purchaser**.  Purchaser shall be in default hereunder upon the occurrence of any one or more of the following events:

(a)    any of Purchaser's warranties or representations set forth herein are untrue or inaccurate in any material respect when made or at Closing;

(b)    Purchaser shall fail to meet, comply with or perform any covenant, agreement, or obligation on its part required within the time limits and in the manner required in this Contract, for any reason other than a Permitted Termination; or

(c)    Purchaser shall fail to deliver at the Closing any of the items required of Purchaser in Section 7.5(b) hereof, for any reason other than a Permitted Termination.

IN THE EVENT OF A DEFAULT BY PURCHASER HEREUNDER, SELLER, AS SELLER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH DEFAULT, SHALL BE ENTITLED TO TERMINATE THIS CONTRACT BY NOTICE TO PURCHASER AND RETAIN PURCHASER'S EARNEST MONEY, INCLUDING ANY INTEREST ACCRUED THEREON, IT BEING AGREED BETWEEN PURCHASER AND SELLER THAT SUCH SUM SHALL BE LIQUIDATED DAMAGES, AND NOT A PENALTY OR FORFEITURE, FOR A DEFAULT BY PURCHASER HEREUNDER BECAUSE OF THE DIFFICULTY, INCONVENIENCE AND UNCERTAINTY OF ASCERTAINING ACTUAL DAMAGES FOR SUCH DEFAULT.    THE PARTIES HEREBY ACKNOWLEDGE THAT SUCH SUM

REPRESENTS A REASONABLE AND MUTUAL ATTEMPT BY SELLER AND PURCHASER TO ANTICIPATE THE ACTUAL DAMAGES OF SELLER DUE TO SUCH A DEFAULT BY PURCHASER.

## ARTICLE X
## Miscellaneous

10.1    **Casualty Loss**. Prior to the Closing, risk of loss with regard to the Property shall be borne by the Seller. If the Improvements or any of the Personal Property are damaged or destroyed prior to Closing, then:

(a)    If the cost of repairing such damage is less than or equal to $50,000.00, as determined by an architect or other qualified professional selected by Purchaser, who is reasonably acceptable to the Seller, then, at the Seller's option [such election to be made in writing within thirty (30) days of such event]: (i) Seller shall repair such damage as promptly as is reasonably possible, restoring the damaged property at least to its condition immediately prior to such damage, and, in the event such repairs have not been completed prior to Closing, then the Closing nevertheless shall proceed as scheduled, and Purchaser may direct the Title Company to withhold from the Seller in an escrow account the funds necessary to make such repairs until the Seller has repaired such damage pursuant to the provisions hereof, at which time such funds shall be distributed to the Seller; or, (ii) Seller shall assign to Purchaser all insurance proceeds payable with respect to such damage, and the Purchaser shall receive a cash credit against the Purchase Price for the amount of the deductible under the Seller's insurance policy, and for the amount by which the estimated costs of repair exceed the estimated insurance proceeds, and the Purchaser shall be obligated to proceed to purchase the Property [such election to be made in writing within thirty (30) days of such event] in accordance with the terms hereof; or,

(b)    If the cost of repairing such damage is greater than $50,000.00, as determined by an architect or other qualified professional selected by Purchaser, who is reasonably acceptable to the Seller, then, at the Purchaser's option [such election to be made in writing within thirty (30) days of such event]: (i) Purchaser may elect to terminate this Contract by written notice to Seller, which shall be a Permitted Termination as provided in Section 9.1 hereof; (ii) Seller shall, at Seller's sole expense, repair the damages promptly as is reasonably possible, restoring the damaged property at least to its condition immediately prior to the damage, and the Closing hereunder shall be deferred until such repairs are made; or, (iii) Seller shall assign to Purchaser all insurance proceeds payable with respect to such damage, and the Purchaser shall receive a cash credit against the Purchase Price for the amount of the deductible under the Seller's insurance

policy, and for the amount by which the estimated costs of repair exceed the estimated insurance proceeds, and the sale shall be closed without the Seller's repairing such damage.

10.2    **Condemnation.**    If, prior to the Closing, condemnation proceedings are threatened or commenced with respect to any portion of the Land and Improvements, Purchaser may terminate this Contract by delivering a written termination notice to Seller on or prior to the Closing Date, which shall be a Permitted Termination as provided in Section 9.1 hereof. Prior to Purchaser's termination of this Contract, or if Purchaser does not terminate this Contract, both the Seller and the Purchaser, by and through their respective attorneys, shall have the right to appear in such condemnation proceedings and defend their interests in the Real Property and Improvements. Any award in condemnation made prior to the Closing shall become the property of the Seller, and the Purchase Price shall be reduced by the amount of the gross condemnation award made to the Seller. An award in condemnation after the Closing shall be the property of the Purchaser, and the Purchase Price shall not be reduced thereby.

10.4    **Notices**. Any notices, consents or other communications required or permitted to be given pursuant to this Contract must be in writing and shall be sent to the address set forth below (or such other address as the party might hereafter designate for itself by notice to the other parties as required hereby). Any such notice or communication shall be sufficient if sent by registered or certified mail, return receipt requested, postage pre-paid; by hand delivery; by overnight courier service; or by telecopy, with an original by regular mail. Any such notice or communication shall be effective on (a) the date of receipt if delivered personally; (b) three (3) days after deposit in an official depository under the regular care and custody of the United States Postal Service, if transmitted by registered or certified mail, return receipt requested; (c) the first business day after the date of deposit, if transmitted by overnight courier service, or (d) the date of transmission with confirmed answer back, if transmitted by telecopy or electronic mail, whichever shall first occur.

If to Seller:               Franklin Pacific Finance, LLLP
                            201 Santa Monica Blvd.
                            Suite 680
                            Santa Monica, California 90401
                            Attn: Stephen J. Collias, President
                            Telecopier: (310) 587-2415
                            Email: sjcollias@franklinpacificfinance.com

with a copy to:             Hagan & Associates
                            110 East Wilshire Avenue, Suite 405
                            Fullerton, CA 92832
                            Attn: Cara Hagan
                            (714) 526-3377

CONTRACT OF SALE - Page 20

Telecopier: (714) 526-3317
Email: carahagan@haganlaw.org

If to Purchaser:              Student Housing Associates. LLC
                             900 South Meadows #1622
                             Reno, Nevada  89521
                             Phone: 781-926-6478


with a copy to:              Melissa S. Wholley, Esq.
                             8 Fox Hill Road
                             Andover, MA 01810
                             Phone: 617-285-5093
                             Fax: 781-926-6433
                             Email: mswholley@gmail.com


If to Title Company:         Commonwealth Title.
                             10233 E. Northwest Hwy. Suite 436
                             Dallas, Texas  75238
                             Attn: Martin Ripoll
                             (214) 373-1516
                             Telecopier: (214) 373-4420

10.5    **Applicable Law.**  This Contract shall be governed by and construed in accordance with the laws of the State of Texas. This Contract is performable and venue for any action hereunder shall be in Dallas County, Texas.

10.6    **Entire Agreement; Modifications.**  This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

10.7    **Counterpart Execution.**  This Contract may be executed in several counterparts, each of which shall be deemed an original, and all of which counterparts together shall constitute one and the same instrument.

10.8    **Captions; Construction.**  The captions which have been used throughout this Contract have been inserted for convenience of reference only and do not constitute matter to be construed in interpreting this Contract. Words of any gender used in this Contract shall be held

CONTRACT OF SALE - Page 21

and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. The words "herein," "hereof," "hereunder," and other similar compounds of the words "here" when used in this Contract shall refer to the entire Contract and not to any particular provision or section.

10.9    **Time is of the Essence**. With respect to all provisions of this Contract, time is of the essence; provided, however, if the final date of any period set forth herein (including, but not limited to, the Closing Date) falls on a Saturday, Sunday or legal holiday under the laws of the State of Texas or the United States of America, the final date of such period shall be extended to the next day that is not a Saturday, Sunday or legal holiday. The term "days" as used herein shall mean calendar days. The term "business days" as used herein shall mean calendar days except Saturdays, Sundays or legal holidays under the laws of the State of Texas, or the United States of America.

10.10    **Invalid Provisions**. If any term, provision, condition or covenant of this Contract or the application thereof to any party or circumstance shall, to the extent, be held invalid or unenforceable, the remainder of this Contract, or the application of such term, provision, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Contract shall be valid and enforceable to the fullest extent permitted by law, and said invalid or unenforceable term, provision, condition or covenant shall be substituted by a term, provision, condition or covenant as near in substance as may be valid and enforceable.

10.11    **Binding Effect**. Prior to Closing, Purchaser shall be entitled to assign its rights under this Contract to a third party entity. Subject to the foregoing, this Contract shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective heirs, personal representatives, successors and permitted assigns. Except as expressly provided herein, nothing in this Contract is intended to confer on any person, other than the parties hereto and their respective heirs, personal representatives, successors and permitted assigns, any rights or remedies under or by reason of this Contract.

10.12    **Further Acts**. In addition to the acts recited in this Contract to be performed by Seller and Purchaser, Seller and Purchaser agree to perform or cause to be performed at the Closing or after the Closing any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

10.13    **Exhibits**. All references to Exhibits contained herein are references to Exhibits attached hereto, all of which are made a part hereof for all purposes the same as if set forth herein verbatim, it being expressly understood that if any Exhibit attached hereto which is to be executed and delivered at Closing contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained herein and as contemplated herein prior to or at the time of execution and delivery thereof.

10.14  **Date of Contract**.   All references to the "date of this Contract" or similar references as used herein shall be deemed to mean the date, whichever is latest, that this Contract has been fully executed by the Seller and Purchaser, as indicated by their signatures below, and delivered to and acknowledged by the Title Company.

10.15  **Attorneys' Fees**.   If either party shall be required to employ an attorney to enforce or define the rights of such party hereunder, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs of suit.

10.16  **Offer and Acceptance**.   The submission of this Contract for examination or its negotiation does not constitute an offer to purchase or sell, and the execution of this Contract by Seller or Purchaser does not constitute a binding Contract until such time as this Contract has been duly authorized and signed by both Purchaser and Seller.

10.17  **Relationship of Parties**.   The parties agree that their relationship is that of Seller and Purchaser, respectively, and that nothing contained herein shall make either party the fiduciary of the other for any purpose whatsoever, nor shall this Contract be deemed to create any form of business organization between the parties, including without limitation a joint venture or partnership, nor is either party granted any right or authority to assume or create any obligation or responsibility on behalf of the other party, nor shall either party be in any way liable for any debt of the other.

10.18 **Survival**.  The agreements, representations, covenants and warranties of the parties contained herein shall survive the Closing and the delivery of the Deed.

10.19 **Assignment**.  Buyer may assign this Agreement at any time without Seller's consent. Any assignee shall be deemed to have made any and all representations and warranties made by Buyer hereunder, as if such Assignee were the original signatory hereto.

10.20. **Contingency**. This Contract is subject to the approval of the Bankruptcy Court. In the event that Seller is unable to obtain all approvals necessary from the Court to complete the transaction contemplated by this Contract, then upon three (3) days written notice from Purchaser, the Earnest Money shall be returned to Purchaser and the Contract shall terminate and thereafter, neither Seller nor Purchaser shall have any further obligations or liabilities to the other hereunder except with respect to the indemnities which shall expressly survive any such termination.

{SIGNATURES TO FOLLOW ON NEXT PAGE}

**SELLER:**

**FRANKLIN PACIFIC FINANCE, LLLP**
a Nevada limited liability limited partnership

By:     **Franklin Finance, Inc.,**
        a Nevada corporation,
        its general partner

        By:_____
                Stephen J. Collias, President

Executed by Seller on

December _6_, 2010


**PURCHASER:**
and/or Permitted Assigns

STUDENT HOUSING AUTHORITY, LLC


By:_____


Executed by Purchaser on

December _6_, 2010

## FIRST AMENDMENT OF CONTRACT FOR SALE

THIS FIRST AMENDMENT OF CONTRACT FOR SALE (this "Amendment") is entered into as of the 11th day of January, 2011, by and between Franklin Pacific Finance, LLLP ("Seller") and Student Housing Associates, LLC ("Purchaser").

### Recitals

A.      Seller and Purchaser are parties to a Contract for Sale dated December 6, 2010 (the "Contract"), pursuant to which Seller has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Seller, certain property known as the Shalamar Apartments, 1640 Aquarena Springs Drive, San Marcos, Texas as more particularly described in the Contract (the "Property"). All capitalized terms used in this Amendment which are defined in the Contract and not otherwise defined in this Amendment shall have the meanings given in the Contract.

B.      Seller and Purchaser desire to amend the Contract to extend the Inspection Period as provided below.

### Statement of Amendment

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.      The parties desire to extend the expiration date of the Inspection Period as defined in Section 5.2 of the Contract from January 21, 2011 until February 4, 2011. All references to the last day of the Inspection Period in the Contract shall mean and refer to February 3, 2011.

2.      The parties desire to extend the Closing Date as defined in Section 7.1 of the Contract from February 21, 2011 until March 7, 2011. All references to the Closing Date in the Contract shall mean and refer to March 7, 2011.

3.      This document may be executed and delivered by exchange of facsimile or electronic mail copies showing the signatures of Seller and Purchaser and those signatures need not be affixed to the same copy. The facsimile or electronic mail copies showing the signatures of Seller and Purchaser will constitute originally signed copies of the same agreement requiring no further execution.

4.      This document may be executed in as many counterparts as may be required; and it shall not be necessary that the signature of, or on behalf of, each party, or that the signatures of all persons required to bind any party, appear on each counterpart; but it shall be sufficient that the signature of, or on behalf of, each party, or that the signatures of the persons required to bind any party, appear on one or more of such counterparts. All counterparts shall collectively constitute a single document.

1

5.    Except as modified herein, all terms and conditions of the Contract remain in full force and effect, as hereby amended, and are hereby ratified and affirmed, as modified by this document.


**{REMAINDER OF PAGE INTENTIONALLY LEFT BLANK- SIGNATURES TO FOLLOW ON NEXT PAGE}**

Seller and Purchaser have executed this Amendment to be effective as of the date first set forth above.

"SELLER"                                    "PURCHASER"

FRANKLIN PACIFIC FINANCE, LLLP              Student Housing Associates, LLC
a Nevada limited liability limited partnership   a Texas limited liability company

By:  Franklin Finance, Inc.

By: _____               By: _____
Stephen J. Collias, President               Michael Geraty, Manager

- 3 -

PROOF OF SERVICE

    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action.  My business address is 506 Santa Monica Blvd, Ste 200, Santa Monica, CA 90401.  On February 10, 2011, I served the within document(s) described as:NOTICE OF MOTION AND MOTION BY DEBTOR (1) FOR AUTHORITY TO SELL ESTATE'S INTEREST IN REAL PROPERTY WITH LIENS TO ATTACH TO PROCEEDS,  AND (2) FOR DETERMINATION OF THE BUYER TO BE A "GOOD FAITH" PURCHASER WITHIN THE MEANING OF BANKRUPTCY CODE § 363(M) PROTECTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF STEPHEN COLLIAS

on the interested parties in this action as stated on the attached mailing list.

    ☒    (BY MAIL) By placing true copies of the foregoing document(s) in a sealed envelope addressed as set forth on the attached mailing list.  I am readily familiar with this firm's practice for collection and processing of correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing contained in affidavit.

    ☐    (BY EXPRESS MAIL) By placing true copies of the foregoing document(s) in a sealed envelope addressed as set forth on the attached mailing list.  I placed each such envelope for collection and overnight mailing following ordinary business practices.  I am readily familiar with this firm's practice for collection and processing of Express Mail to be sent overnight by the U.S. Postal Service.  Under that practice, it would be deposited on that same day in the ordinary course of business, with Express Mail postage thereon fully prepaid, in a post office, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the U.S. Postal Service for receipt of Express Mail.

    ☐    (BY OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express, an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, true copies of the foregoing document(s) in a sealed envelope or package designated by the express service carrier, addressed as set forth on the attached mailing list, with fees for overnight delivery paid or provided for.

    ☐    (BY FAX) By transmitting a true copy of the foregoing document(s) via facsimile transmission from this firm's facsimile machine, to each interested party at the facsimile machine telephone number(s) set forth on the attached mailing list.  Said transmission(s) were completed on the aforesaid date at the time stated on the transmission record issued by this firm's sending facsimile machine.  Each such transmission was reported as complete and without error and a transmission report was properly issued by this firm's sending facsimile machine for each interested party served.  A true copy of each transmission report is attached to the office copy of this proof of service and will be provided upon request.

    ☐    (BY E-MAIL) By transmitting true copies of the foregoing document(s) to the e-mail addresses set forth on the attached mailing list.

    I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on February 10, 2011, at Santa Monica, California.

| Brian Link | /s/ Brian Link |
| --- | --- |
| (Type or print name) | (Signature) |

1

MOTION FOR SALE OF PROPERTY

1

## SERVICE LIST

**By ECF:**

2  Leslie A Cohen leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com
   Sheri Kanesaka sheri.kanesaka@bryancave.com
3  Dare Law dare.law@usdoj.gov
   William D May dp@srwadelaw.com
4  Christopher M McDermott ecfcacb@piteduncan.com
   Hal M Mersel mark.mersel@bryancave.com
5  United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
   Stephen R Wade dlr@srwadelaw.com
6

7  **By Mail:**

Franklin Pacific Finance, LLLP
8  429 Santa Monica Blvd., Suite 625
Santa Monica, CA 90401

9  Hon. Vincent Zurzolo
US Bankruptcy Court
10  255 E. Temple Street
Los Angeles, CA 90012

11
Dare Law
12  Office of United States Trustee
725 S Figueroa Street
13  26th Floor
Los Angeles, CA 90017

14
City of Fort Mitchell, Kentucky
15  2355 Dixie Highway
Fort Mitchell, KY 41017

16
Kenton County Taxes
17  Kenton County Building
303 Court Street, Suite 409
18  Covington, KY 41011

19  A&M Cleaning
193 Valero Drive
20  San Marcos, TX 78666

21  C&J Painting & Carpet
POBox 200573
22  Austin, TX 78720

23

City of Colleyville, Grapevine-
Colleyville ISD
c/o Elizabeth Banda Calvo
Perdue, Brandon, Fielder, Collins &
Mott
P O Box 13430
Arlington, TX 76094-0430

Classified Ventures
2563 Collections Center Drive
Chicago, IL 60693

Cleaning Network
POBox 41975
Austin, TX 78704

Cowboys Painting
15405 Connie Street, #B
Austin, TX 78728

CSN Support Services
252 McGarity
Kyle, TX 78640

Frank's painting
110 N 1H 35
Suite 315-189
Round Rock, TX 78664

Green Grass
5333 Randolph Blvd.
San Antonio, TX 78233

Greensheet
POBox 140721
Austin, TX 78704

HD Supply Facilities Maintenance
10641 Scripps Summit Court
San Diego, CA 92131

J4 Development
2808 Longhorn Blvd., Suite 306
Austin, TX 78758

Premium Cuts Lawn Service and
Maintenance
POBox 820108
Austin, TX 78708

Rasa Floors
POBox 619130
Dallas, TX 75261

South Central Texas Apt. Blue Book
112 West Hopkins Street
San Marcos, TX 78666

Sunset Carpet Care
POBox 142342
Austin, TX 78714

Wilmar
POBox 404284
Atlanta, GA 30384

Worldwide Pest Control
5808 1H 10 West
San Antonio, TX 78201

24

25

26

27

28